John V. Picone III, Bar No. 187226
jpicone@hopkinscarley.com
Jennifer S. Coleman, Bar No. 213210
jcoleman@hopkinscarley.com
C. Gideon Korrell, Bar No. 284890
gkorrell@hopkinscarley.com
HOPKINS & CARLEY
A Law Corporation
The Letitia Building
70 South First Street
San Jose, CA  95113-2406

*mailing address:*
P.O. Box 1469
San Jose, CA 95109-1469
Telephone:     (408) 286-9800
Facsimile:     (408) 998-4790

Attorneys for Plaintiff
PACE Anti-Piracy, Inc.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| PACE ANTI-PIRACY, INC., a California corporation,<br><br>    Plaintiff,<br><br>  v.<br><br>INSIDE SECURE, a French legal entity, and INSIDE SECURE CORP., a Delaware corporation,<br><br>    Defendants. | CASE NO.  4:17-cv-05860-HSG<br><br>**PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)**<br><br>Hearing Date: March 22, 2017<br>Time:   2:00 p.m.<br>Location:  Courtroom 2, 4th Floor<br>Judge:   Hon. Haywood S. Gilliam, Jr.<br>Trial Date: None |

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

614\2873829.11

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ............................................................................................................... 1

II.   BACKGROUND ............................................................................................................... 2

    A.    The '149 Patent ................................................................................................... 2

        1.    PACE's Patented Technology Makes Software Piracy Much Harder ........ 2

III.  ANALYSIS ....................................................................................................................... 5

    A.    Legal Standard .................................................................................................... 5

        1.    Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6) .................................... 5

        2.    Patent Validity Challenges Under 35 U.S.C. § 101 ................................... 5

        3.    The '149 Patent is Directed to Patentable Subject Matter Under *Alice* and its Progeny ............................................................................... 6

    B.    The Claims of the '149 Patent Are Directed to an Improvement in Computer Software Anti-Piracy Technology ...................................................... 8

        1.    The Claims Are Not Abstract Because They Provide Specific, Detailed Instructions to Better Implement and Disguise Anti-Piracy Technology ....................................................................................... 10

            a.    The Claims Are Eligible Under the post-*Alice* Guidance from the USPTO ........................................................... 12

            b.    Inside Secure's Arguments Rely on Improper Generalization and False Equivalency ..................................... 14

        2.    The '149 Patent Claims are Patent Eligible Under *Alice* Step Two .......... 18

            a.    The '149 Patent Claims Recite Specific Limitations and Do Not Preempt the Field .................................................. 18

            b.    The '149 Patent Claims Include Inventive Concepts ................... 20

IV.   CONCLUSION ............................................................................................................... 22

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

- i -

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)                                   4:17-CV-05860-HSG

# TABLE OF AUTHORITIES

**Page**

## Cases

*Alice Corp. Pty. Ltd. v. CLS Bank Int'l*,
134 S. Ct. 2347 (2014) ..................................................1, 2, 5, 6, 7, 8, 12, 13, 14, 15, 18, 20, 21

*Ancora Techs., Inc. v. HTC Am., Inc.*,
2017 WL 6389329 (W.D. Wash. 2017) .......................................................................16, 17, 20

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ......................................................................................................5

*Bancorp Servs., LLC v. Sun Life Assurance Co. of Canada*,
687 F.3d 1266 (Fed. Cir. 2012) ................................................................................8, 21

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ......................................................................................................5

*Blue Spike, LLC v. Google Inc.*,
2015 WL 5260506 (N.D. Cal. Sept. 8, 2015) ...........................................................18

*California Inst. of Tech. v. Hughes Commc'ns Inc.*,
59 F. Supp. 3d 974 (C.D. Cal. 2014).............................................................................7

*Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*,
776 F.3d 1343 (Fed. Cir. 2014)............................................................................6, 8, 20, 21

*Contentguard Holdings, Inc. v. Amazon.com, Inc.*,
142 F. Supp. 3d 510 (E.D. Tex. 2015) .......................................................................18

*CyberSource Corp. v. Retail Decisions, Inc.*,
654 F.3d 1366 (Fed.Cir.2011)......................................................................................7

*DDR Holdings, LLC v. Hotels.com, L.P.*,
773 F.3d 1245 (Fed. Cir. 2014)...........................................................................6, 15, 19

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016)....................................................1, 6, 7, 8, 9, 10, 15, 18

*FairWarning IP v. Iatric Sys., Inc.*,
839 F.3d 1089 (Fed. Cir. 2016)................................................................................6, 18

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
2015 WL 7351450 (N.D. Cal. 2015).........................................................................14

*Hybritech Inc. v. Monoclonal Antibodies, Inc.*,
802 F.2d 1367 (Fed. Cir. 1986).................................................................................15

*Intellectual Ventures I LLC v. Erie Indemnity Co.*,
2017 WL 5041460 (Fed. Cir. 2017)...........................................................................16

*Intellectual Ventures I LLC v. Symantec Corp.*,
100 F. Supp. 3d 371 (D. Del. 2015)..........................................................................14

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)                                    4:17-CV-05860-HSG

# TABLE OF AUTHORITIES
## (continued)

**Page**

*Intellectual Ventures I LLC v. Symantec Corp.*,
838 F.3d 1307 (Fed. Cir. 2016)..................................................................................................18

*Manzarek v. St. Paul Fire & Marine Ins. Co.*,
519 F.3d 1025 (9th Cir. 2008)......................................................................................................5

*Mayo Collaborative Servs.*,
132 S. Ct. 1296 (2012) ...................................................................................................6, 7, 8, 21

*McRO, Inc. v. Bandai Namco Games Am., Inc.*,
837 F.3d 1299 (Fed. Cir. 2016).......................................................................................7, 8, 9, 10

*Mortgage Grader, Inc. v. First Choice Loan Servs., Inc.*,
811 F.3d 1314 (Fed. Cir. 2016)...............................................................................................8, 21

*OpenTV, Inc. v. Apple, Inc.*,
2015 WL 1535328 (N.D. Cal. Apr. 6, 2015) .............................................................................18

*Papst Licensing GmbH & Co. KG v. Xilinx Inc.*,
193 F. Supp. 3d 1069 (N.D. Cal. 2016) .....................................................................................21

*Planet Bingo, LLC v. VKGS LLC*,
576 F. App'x 1005 (Fed. Cir. 2014) ..........................................................................................18

*In re Roslin Inst. (Edinburgh)*,
750 F.3d 1333 (Fed. Cir. 2014)....................................................................................................5

*Stoneeagle Servs., Inc. v. Pay-Plus Solutions, Inc.*,
2015 WL 4042097 (M.D. Fla. 2015) .........................................................................................19

*In re TLI Commc'ns LLC Patent Litig.*,
823 F.3d 607 (Fed. Cir. 2016)......................................................................................................7

*Tranxition, Inc. v. Lenovo (U.S.) Inc.*,
2016 WL 6775967 (Fed. Cir. Nov. 16, 2016).............................................................................7

*Visual Memory LLC v. NVIDIA Corp.*,
867 F.3d 1253 (Fed. Cir. 2017)............................................................................................16, 18

**Statutes**

35 U.S.C. § 101 .............................................................................................................5, 6, 15, 16

35 U.S.C. § 112 ...............................................................................................................................16

Fed. R. Civ. P. 12(b)(6)............................................................................................................5, 6, 16

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

- iii -

## I.

## INTRODUCTION

The claims of U.S. Patent No. 6,880,149 titled "Method for Runtime Code Integrity Validation Using Code Block Checksums" (the " '149 Patent") are patent eligible because, viewed in conjunction with the specification, they are:  i) directed to concrete, specific, non-abstract methods and computer-readable program instructions for runtime validation of a software program; ii) recite specific limitations that do not preempt the field; iii) are directed to a technical application that is uniquely rooted in computer technology and directed to improving it; and iv) cover inventive concepts that provide tangible solutions to solve a longstanding problem.

Defendants Inside Secure S.A. and Inside Secure Corp. (collectively, "Inside Secure") fail to establish that asserted claims 1, 2, 3, 5, 6, 27, 30, and 31 of the '149 Patent are patent ineligible.  Inside Secure adopts an overbroad interpretation of *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 134 S. Ct. 2347 (2014) (hereafter "*Alice*"), essentially arguing that the Supreme Court made software patents "by and large" unpatentable.  Like much of Inside Secure's analysis this is a gross oversimplification.  *Alice* and its progeny, like *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327 (Fed. Cir. 2016) (hereafter "*Enfish*"), do not simply declare software patents unpatentable, rather they hold that software claims are patentable if their plain focus is on an improvement to computer technology or its capabilities.  *Enfish,* at 1336.  That is the case here.

First, the claims fall squarely within patentable subject matter because they are not abstract under step one of the *Alice* analysis.  Rather, they are "directed to a specific implementation of a solution to a problem in the software arts."  *Enfish, at* 1339 (finding patent eligible software claims directed to storing data in databases in an innovative and beneficial manner).  Second, the United States Patent and Trademark Office ("USPTO") has promulgated guidance confirming that claims similar to the '149 Patent are not abstract and are patentable subject matter under *Alice*, step one.  Third, Inside Secure's arguments ignore the specific limitations of the asserted claims of the '149 Patent that go well beyond the use of generic technology in a well-known environment.  Rather, the claims are directed to a specific method to improve existing anti-piracy technology and disclose a novel and concrete method, with explicit

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

614\2873829.11

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)                                    4:17-CV-05860-HSG

and detailed instructions, to harden existing anti-piracy technology.  These specific, concrete instructions furnish more than enough inventive concepts to satisfy the second prong of the *Alice* analysis.

Finally, the main thrust of Inside Secure's arguments uses an overly broad, genericized version of the claims, ignoring warnings of the Supreme Court and Federal Circuit that doing so is improper.  Accordingly, the Court should deny Inside Secure's motion and confirm that the '149 Patent claims are patent eligible.

## II.

## BACKGROUND

### A.     The '149 Patent

#### 1.      PACE's Patented Technology Makes Software Piracy Much Harder

Since the advent of the personal computer, software manufacturers have had to undertake the added task of including features within their application programs whose only purpose is to prevent unauthorized copying or modification of the software.  The effort to defeat such anti-tampering and security mechanisms is commonly known as "hacking."  ('149 Patent at 1:14-27.) The '149 Patent explains that one common motivation for hacking is to create an unprotected version of an application program allowing the hacker to make unlimited bootleg copies of the application program.  (*Id*. at 1:23-27.)  The '149 Patent acknowledges the reality that hacking could destroy the financial incentive to create new application programs, thereby stifling innovation.  (*Id.* at 1:27-31.)

The '149 Patent explains that prior art methods of protecting software from piracy such as the use of encryption schemes, digital signatures, and license files work "fairly well" but share a significant weakness in that they typically have a single location within the operation of the application program where the validation step occurs and that this single point of vulnerability can be located and defeated by a dedicated hacker.  (*Id*. at 1:33-37.)  The '149 Patent offers an improvement on past efforts to prevent software hacking through a method of embedding portions of the validation code throughout the source code of a software application and then stripping away the evidence of the validation in the executable version that is shipped to a customer.  (*Id*. at

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

614\2873829.11                                                   - 2 -

1:65-2:25.)  This solution taught by the '149 Patent of first embedding validation code in the *source code domain*, and then removing evidence of the validation code in the *executable domain*, results in creating a protected software application where it is extremely difficult for a hacker to locate and defeat the implementation of the validation code.  The inventions taught in the '149 Patent do this in several ways.  First, the '149 Patent teaches embedding validation functions in many places throughout the application program rather than in one location.  This results in the validation activity taking place at various points during the runtime of the application program, as opposed to just during initialization, making its location within the code difficult for a hacker to detect.  (*Id*. at 2:15-25, 6:66-7:25.)  Second, the '149 Patent teaches inserting what is the computer-equivalent of breadcrumbs into the source code, locating the breadcrumbs in the executable file (the output of the compiled source code), amending part of the executable file (referred to in the patent as "checksum data structure") to point to the locations demarked by the breadcrumbs, and removing the breadcrumbs from the executable file so that they cannot be located by a hacker.  (*Id*. at 6:45-55.)  Third, the '149 Patent teaches running the validation algorithm on the portion(s) of the executable file demarked by the breadcrumbs to obtain the value(s) and then inserting the value(s) into executable file.  (*Id*. at 4:37-47.)

Figures 4a and 5 of the '149 Patent, reproduced below, illustrate how in one embodiment an application program (400) is built containing the anti-piracy protections and then processed after it is compiled into an executable (500)[1]:

---

[1] Most modern software is created using what are commonly known as high-level general purpose programming languages such as C++ or Java.  Software developers write programming instructions ("source code") using these languages.  These instructions are then compiled into a format that is readable by a computer processor, known as binary or executable.  It is the executable that is most often sold to the customer/end-user.  While most general purpose programming languages can be read and interpreted by a human (the syntax and grammar have some commonality with a spoken language) reading (and programming) in machine code is virtually impossible.  Hackers will typically employ timing tools such as pattern matching software and function call analyzers to indirectly detect the location of validation functions within the executable. (*See, e.g.*, '149 Patent at 1:39-52; 7:5-8 and 7:19-22 "Each checksum segment in the preferred embodiment is short, and consumes a small amount of processing power from the CPU, making it harder to detect . . . [t]he more indirect the interaction between the main event loop and the random segment partial checksum process, the more difficult to locate and defeat by a hacker.")

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ◆ PALO ALTO

614\2873829.11                                  - 3 -

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)                                    4:17-CV-05860-HSG



**Figure 4a**                                                         **Figure 5**

As shown, the '149 Patent teaches the code modifications (406a, 408, 406b, and 407) of the application program (400) are built within the main program code rather than at program initialization (401) which was the more common practice at the time.  (*Id*. at 8:17-23.)  Figure 4a also teaches the placement of beginning (410), end (411), and related checksum data structure (412) symbols (breadcrumbs) to demark the areas in which the validation code is to examine and compare values.  (*Id*. at 8:8-12, 49-54.)  Figure 5 is the executable version of the code and shows that the symbols (410, 411, and 412) have been removed.  (*Id*. at 9:1-11.)

Because the determination of the final checksum value can be only performed after the application program has been compiled,[2] a placeholder value is first inserted into the source code and the final checksum values are later inserted into the executable code after the executable code has been created and the checksum has been calculated.  (*Id*. at 5:19-42.)

The end result of the process taught by the '149 Patent is a protected program application executable file that, when run on a computer, performs validation of the software integrity at

---

[2] As illustrated in Inside Secure's Motion, any small change to a set of data will result in a completely different checksum value.  (Inside Secure's Motion, hereafter "Mot.", at 4:11-15.) Thus, at least the portion of the application program that is selected to be analyzed by the validation code must be in its final (executable) form before the checksum value can be determined.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)                                    4:17-CV-05860-HSG

various times during program operation that cannot be detected. While the validation is done by using the known technique of checksum comparison, the block(s) upon which the checksum is to be computed and the value in which the computed checksum is to be compared is hidden within millions of instructions that are being executed by the normal application code. (*Id.* at 7:66-8:7.)

So it is a gross oversimplification for Inside Secure's Motion to describe the '149 Patent inventions as simply having the generic steps of creating a program to perform a mathematical calculation, performing the calculation, removing evidence that is has been performed and comparing the result of the calculation with a known value. (Mot. at 1:17-20.)

# III.

# ANALYSIS

## A.    Legal Standard

### 1.    Motion to Dismiss Under Fed. R. Civ. P. 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a district court must dismiss a complaint if it fails to state a claim upon which relief can be granted. To survive a Rule 12(b)(6) motion to dismiss, the plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This "facial plausibility" standard requires the plaintiff to allege facts that add up to "more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Further, the Court must "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008).

### 2.    Patent Validity Challenges Under 35 U.S.C. § 101

Section 101 of the Patent Act describes the scope of patentable subject matter as encompassing "any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof." 35 U.S.C. § 101. It is well settled that laws of nature, natural phenomena, and abstract ideas are excluded from the universe of patentable subject matter. *Alice, at* 2354. Whether a claim recites patent-eligible subject matter under Section 101 is a question of law. *In re Roslin Inst. (Edinburgh)*, 750 F.3d 1333, 1335 (Fed. Cir. 2014). The

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

614\2873829.11                                  - 5 -

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)                                   4:17-CV-05860-HSG

Federal Circuit has "repeatedly recognized that in many cases it is possible and proper to determine patent eligibility under 35 U.S.C. § 101 on a Rule 12(b)(6) motion." *FairWarning IP v. Iatric Sys., Inc.*, 839 F.3d 1089, 1097 (Fed. Cir. 2016) (citation omitted).

### 3. The '149 Patent is Directed to Patentable Subject Matter Under *Alice* and its Progeny

Defendants' Motion asserts that the '149 Patent fails to claim patent-eligible subject matter under 35 U.S.C. § 101. The Supreme Court and Federal Circuit have articulated a two-part test for determining whether a claim's subject matter is patent-eligible. First, a court must determine whether a claim is directed to a patent-ineligible abstract idea. *Content Extraction & Transmission LLC v. Wells Fargo Bank, Nat'l Ass'n*, 776 F.3d 1343, 1346-47 (Fed. Cir. 2014) (*citing Mayo Collaborative Servs.*, 132 S. Ct. at 1296-97); *see also Alice, at* 2355 and 2357. For the computer-based claims of the '149 Patent, PACE can satisfy Step 1 of *Alice* by showing that "the claimed solution is necessarily rooted in computer technology in order to overcome a problem specifically arising in the realm of computer networks." *DDR Holdings, LLC v. Hotels.com, L.P.*, 773 F.3d 1245, 1257 (Fed. Cir. 2014).

Neither the U.S. Supreme Court nor the Federal Circuit has set forth a bright line test to identify abstract ideas. *See, e.g., Alice,* at 2357 (noting that "[the U.S. Supreme Court] need not labor to delimit the precise contours of the 'abstract ideas' category in this case"). As a result, in evaluating whether particular claims are directed to patent-ineligible abstract ideas, courts have generally begun by "compar[ing] claims at issue to those claims already found to be directed to an abstract idea in previous cases." *Enfish, at* 1334.

For example, courts have considered whether the claims purport to "improve the functioning of the computer itself," *Alice*, at 2359, which may suggest that the claims are not abstract, or instead whether "computers are invoked merely as a tool" to carry out an abstract process. *Enfish*, at 1335-36, noting that the Court did not believe that claims directed to software, as opposed to hardware, are inherently abstract.). In addition, the Federal Circuit also emphasized that claims are drawn to an abstract idea if they are directed to "the use of conventional or generic technology in a nascent but well-known environment, without any claim

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

614\2873829.11

- 6 -

that the invention reflects an inventive solution to any problem presented by combining the two." *In re TLI Commc'ns LLC Patent Litig.*, 823 F.3d 607, 612 (Fed. Cir. 2016). Thus, claims that describe "a new telephone, a new server, or a new physical combination of the two" are not abstract, but claims that describe a system and methods in "purely functional terms" without "any technical details for the tangible components" are abstract. *Id.*

Following the decisions in *Enfish* and *TLI*, the Federal Circuit has characterized the key inquiry as requiring a court to "look to whether the claims in these patents focus on a specific means or method that improves the relevant technology or are instead directed to a result or effect that itself is the abstract idea and merely invoke generic processes and machinery." *McRO, Inc. v. Bandai Namco Games Am., Inc.*, 837 F.3d 1299, 1314 (Fed. Cir. 2016); *see also Tranxition, Inc. v. Lenovo (U.S.) Inc.*, 2016 WL 6775967, at \*2 (Fed. Cir. Nov. 16, 2016) ("For claims solely implemented on a computer, we have previously found it 'relevant to ask whether the claims are directed to an improvement to computer functionality versus being directed to an abstract idea.'" (*quoting Enfish*, at 1335)).

Another helpful tool used by courts in the abstract idea inquiry is consideration of whether the claims are, in essence, directed to a mental process or a process that could be done with pen and paper. *See CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1372 (Fed.Cir.2011) (claim for verifying the validity of a credit card transaction over the Internet was invalid because the "steps can be performed in the human mind, or by a human using a pen and paper").[3]

If the court determines under Step 1 of *Alice/Mayo* that the asserted claims are directed to an abstract idea, then the court moves on to Step 2 of *Alice/Mayo* and considers the elements of the claim, individually and as an ordered combination, to assess whether the additional elements

---

[3]One court has noted that, like all tools of analysis, the "pencil and paper" analogy must not be unthinkingly applied. *See California Inst. of Tech. v. Hughes Commc'ns Inc.*, 59 F. Supp. 3d 974, 995 (C.D. Cal. 2014) (viewing pencil-and-paper test as a "stand-in for another concern: that humans engaged in the same activity long before the invention of computers," and concluding that test was unhelpful where "error correction codes were not conventional activity that humans engaged in before computers"). The same analysis could be applied here in that modifying source code to implement checksum validation, compiling the code to create an executable and then further modifying the executable code to remove evidence of the checksum validation is not conventional activity engaged by humans before computers.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

614\2873829.11

- 7 -

transform the nature of the claim into a patent-eligible application of said abstract idea. *Content Extraction,* 776 F.3d at 1347; *Alice,* at 2354. "This is the search for an 'inventive concept'— something sufficient to ensure that the claim amounts to 'significantly more' than the abstract idea itself." *Content Extraction*, 776 F.3d at 1347 (*quoting Mayo Collaborative Servs.*, 132 S. Ct. at 1294). PACE satisfies Step 2 of *Alice/Mayo* by adding the "inventive concept" of embedding validation code to the application program in the ***source code domain***, and then removing evidence of the validation code in the ***executable domain***, which is sufficient to ensure that the asserted claims amount to significantly more than the abstract idea itself.

The U.S. Supreme Court has made clear that a transformation of an abstract idea to a patent-eligible application of the idea requires more than simply reciting the idea followed by "apply it." *Alice,* at 2357 (*quoting Mayo Collaborative Servs.*, 132 S.Ct. at 1294). In that regard, the Federal Circuit has repeatedly held that "[f]or the role of a computer in a computer-implemented invention to be deemed meaningful in the context of this analysis, it must involve more than the performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Content Extraction*, 776 F.3d at 1347–48 (*quoting Alice*, at 2359) (alterations in original); *see also Mortgage Grader, Inc. v. First Choice Loan Servs., Inc.*, 811 F.3d 1314, 1324–25 (Fed. Cir. 2016) (holding that "generic computer components such as an 'interface,' 'network,' and 'database'... do not satisfy the inventive concept requirement."); *Bancorp Servs., LLC v. Sun Life Assurance Co. of Canada*, 687 F.3d 1266, 1278 (Fed. Cir. 2012) ("To salvage an otherwise patent-ineligible process, a computer must be integral to the claimed invention, facilitating the process in a way that a person making calculations or computations could not.").

**B.    The Claims of the '149 Patent Are Directed to an Improvement in Computer Software Anti-Piracy Technology**

*Enfish* compels the conclusion that the challenged claims, viewed in light of their respective specifications, are not directed to an abstract idea, and thus cover patentable subject matter. The claims, like those in *Enfish* and *McRO*, are directed on their face to an improvement to computer technology: a mechanism for validating software integrity that is undetectable (and

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

614\2873829.11                                              - 8 -
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)                                    4:17-CV-05860-HSG

therefore undefeatable) by a hacker. *See Enfish*, at 1339 (structure recited in claims was "a specific type of data structure designed to improve the way a computer stores and retrieves data in memory"); *McRO*, 837 F.3d at 1313-14 (claims were "limited to rules with specific characteristics," and focused on "a specific asserted improvement in computer animation, i.e., the automatic use of rules of a particular type"). Based on this, PACE asserts that the challenged claims, viewed as an ordered combination, impose specific limitations sufficient under *Enfish* and *McRO* to survive at the motion to dismiss stage.

The claims of the '149 Patent are plainly tied to computer technology and offer a solution to the problem of software piracy that has plagued the computer software industry since the advent of the personal computer. Independent Claims 1 and 27 of the '149 Patent are directed to methods of embedding validation code into a software program in the source domain and then removing and redistributing information relating to the validation code in the binary domain to make the validation code virtually undetectable:

> 1. A method for performing runtime checksum validation of a software program, the method comprising the steps of:
>   (a) providing a software tool as well as instructions on how to modify the software program to submit to the tool, wherein executable code is generated from the modified software program that includes checksum information for the tool to use when processing the software program;
>   (b) in response to the executable code being submitted to the tool, the tool calculates at least one checksum, embeds the checksum in the executable code in a location indicated by the checksum information, and strips the checksum information from the executable code; and
>   (c) delivering the executable code as a protected software program, wherein during execution, the protected software application generates a new checksum and determines that the software application has been modified if the new checksum fails to match the embedded checksum.
>
> 27. A method for determining if protected software is modified, the method comprising the steps of
>   (a) instructing a software developer to modify an executable version of the software to be protected by performing the steps of:
>     (i) exporting predefined checksum related data,
>     (ii) adding code to compute a new checksum at runtime,
>     (iii) adding code to compare the computed runtime checksum with a checksum stored in the executable,
>     (iv) determining that the protected software has been modified if the checksums do not compare; and

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

614\2873829.11

- 9 -

(b) wrapping the executable in a anti-piracy software wrapper, and performing the steps of:
(i) automatically detecting the exported checksum related data,
(ii) computing a checksum of the executable,
(iii) embedding the checksum in the executable; and
(iv) removing the exported checksum related symbols from the executable.

### 1. The Claims Are Not Abstract Because They Provide Specific, Detailed Instructions to Better Implement and Disguise Anti-Piracy Technology

The challenged claims, viewed as an ordered combination, impose specific limitations sufficient under *Enfish* and *McRO* to survive at the motion to dismiss stage. *See Enfish*, at 1337 ("Moreover, our conclusion that the claims are directed to an improvement of an existing technology is bolstered by the specification's teachings that the claimed invention achieves other benefits over conventional databases, such as increased flexibility, faster search times, and smaller memory requirements.").

As the specification explains, the claims are specifically directed to an improvement over existing computer software technology: a method of embedding code integrity validation functionality such that it cannot be detected by a would-be hacker. For example:

- "[The state of the art methods of preventing software piracy] typically share a serious weakness if attacked appropriately. This weakness is a single point of validation within the protected software, typically prior to the execution of the main application program code." ('149 Patent, at 1:35-39.)

- "If this single point can be located and neutralized, no matter how hack-proof the validation process is, once it is disconnected from the application, it is no longer able to perform the desired validation function." (*Id.* at 1:39-43.)

- "Most protection schemes have a single or small number of points, localized in code and usually localized in time of execution prior to, or at the beginning of, the application execution, making it easier for a hacker to locate and neutralize." (*Id.* at 1:43-46.)

- "Additionally, the code used to perform validation is typically identical in every instance for a given method, and thus easy to locate using a pattern-matching

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

614\2873829.11

- 10 -

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)                    4:17-CV-05860-HSG

search. Once neutralization has been accomplished, the application typically runs correctly with no validation required." (*Id.* at 1:46-51.)

- "[There is a need for] an anti-piracy method that runs during the normal execution of the application, validating the software over a period of time rather than prior to the execution of the main application, . . . . a method that allows the validation code to be customized and located in multiple places within the code base, thus increasing the difficulty of any attempts to locate and neutralize it, . . . . [and] a method that allows custom variations to the required validation code to prevent location by simple pattern matching of the code." (*Id.* at 1:51-63.)

To address these specific needs for advancement in the technology, the '149 Patent claims and specification provide the following instructions on how, going well beyond a black box that is linked to the desired function, to actually build and an implement the tool that can be used to protect the software application.

- Modifying the software program in the source code domain in a specific way, including (1) inserting calls to the integrity validation function in multiple places within the main body of the software program, (2) inserting symbols throughout the code to demark the beginning(s) and end(s) of the software block(s) to be monitored by the integrity validation function, and (3) inserting symbol(s) that point to the checksum data structure(s) which will contain the fixed checksum value that is compared to the one calculated by the integrity validation function. ('149 Patent at 5:6-17). The specification of the '149 Patent teaches a method whereby the modifications can select a single block, multiple blocks, or overlapping blocks for validation where either the full or partial (to be aggregated later) checksum protected blocks. (*Id.* at 5:44-54).

- Validating random-sized sequential segments of the code within the identified blocks to conduct partial computation of the checksum at various points during runtime and the results are aggregated to be compared with the precomputed value. The distribution and portioning of the validation function minimizes computing

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

614\2873829.11                                          - 11 -

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)                                    4:17-CV-05860-HSG

resources which offers the combined benefit of reducing processor demand (i.e., improved computer performance) and the elimination of any single event to spike in the computer's processor which could indicate the location of the validation function to a hacker. (*Id*. at 7:2-42.)

- The '149 Patent additionally provides a specific algorithm or those embodiments that employ the use of overlapping blocks. (*Id*. at 5:43-54, *see also*, 10:9-11:23, Fig. 9). It also teaches the developer to insert a second set of exported symbols that provide the starting address of the checksum data structure related to that specific software block containing the checksum information. (*Id*. at 5:6-17.)

- The '149 Patent then teaches a checksum data structure containing a checksum algorithm selector and space allocation for the actual checksum which is to be inserted after the source code is compiled. (*Id*. at 5:18-30.)

- The Patent teaches embedding the computed checksum value directly into the executable code. (*Id*. at 4:36-0.) Finally, the developer should use the tool to remove the checksum information (the exported symbols showing the code to be protected, the location of the checksum value and the checksum type) so that the checksum protection is harder to locate. (*Id*. at 4:40-46.)

Now the developer has a protected software program that is ready for use and protected from hackers identifying and stripping out the checksum anti-piracy functions or otherwise making unauthorized modifications to the executable for nefarious purposes.[4]

a.    **The Claims Are Eligible Under the post-*Alice* Guidance from the USPTO[5]**

Inside Secure's argument that the '149 Patent must cover ineligible subject matter because

---

[4] Far from being an abstraction, the '149 Patent provides specific instructions for configuration of the run time implementation of the checksum function for both Apple and Windows operating systems. ('149 Patent at 6:8-26.)

[5] PACE acknowledges that the USPTO's Eligibility Guidelines ("Guidelines") are not binding authority on this Court. PACE instead argues that the Guidelines are persuasive to refute Inside Secure's argument that the pre-*Alice* examination of the '149 Patent somehow makes it a "pure software patent" that *Alice* is purportedly intended to abolish. (Mot., at 1:26-27 and 3:10-18.)

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

614\2873829.11                                             - 12 -
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)                              4:17-CV-05860-HSG

it is a "software patent" that underwent examination at a time before the *Alice* decision was announced by the Supreme Court is unsupported by the law and facts of this particular case. Rather, USPTO's post-*Alice* guidance further confirms that the claimed subject matter of the '149 Patent is patent eligible.

The USPTO promulgated examples of "patent eligible" claims to its examiners to assist in helping to determine if a claim recites an "abstract concept."  Importantly, the USPTO's first example of an eligible software invention that is not directed to an abstract idea is similar to the '149 Patent claims asserted here.  Specifically, the first example of a patent eligible claim covers "Isolating and Removing Malicious Code from Electronic Messages," and includes the steps of (1) receiving an electronic communication . . ., (2) storing the communication in the quarantine sector of the memory of the computer . . ., (3) scanning [for] malicious code marker[s]  . . . and, (4) creating a new data file [with suspicious code removed].  (Request for Judicial Notice, ¶1, Ex. A, Part One, Hypothetical Example 1, claim 1.)  The USPTO's explanation of why this hypothetical claim is patent eligible applies equally to the claims of the '149 Patent because both provide a series of acts to prevent a computer from running unauthorized software (either malicious or pirated), a "concept inextricably tied to computer technology," and therefore non-abstract:

> The method claim recites a series of acts for protecting a computer from an electronic communication containing malicious code. Thus, the claim is directed to a process, which is one of the statutory categories of invention (Step 1: YES).

> …The claim is directed towards physically isolating a received communication on a memory sector and extracting malicious code from that communication to create a sanitized communication in a new data file. Such action does not describe an abstract concept . . . . In contrast, the invention claimed here is directed towards performing isolation and eradication of computer viruses, worms, and other malicious code, a concept inextricably tied to computer technology and distinct from the types of concepts found by the courts to be abstract. . . . Accordingly, the claim is not directed to any judicial exception (Step 2A: NO). The claim is eligible.

*Id.* at p. 3.

Here, the hypothetical claim is very similar to the '149 Patent's process of (a) modifying a software program to include verification code and checksum information; (b) compiling the

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

614\2873829.11                                              - 13 -

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)                                    4:17-CV-05860-HSG

modified source code to generate executable code containing checksum information; (c) scanning the executable code for checksum information; and (d) removing/modifying the checksum information in the executable code to render the embedded verification code virtually impossible to subsequently locate. This claimed process of modifying and delivering a protected software application having a validation process that is virtually undetectable to a hacker is intended to physically modify the software application of a user who seeks to have it protected from unauthorized modifications or tampering.

This is simply not an abstract idea because these steps are directed towards improving computer security through innovative techniques of ensuring that authorized and non-tampered software is operating on a computer. The '149 Patent claims are directly comparable to the USPTO's hypothetical because the '149 Patent is necessarily rooted in computer technology. That the '149 Patent is directed to software piracy detection, which must be performed in the computing context, demonstrates that the inventions in the '149 Patent would have "no significance outside the realm of computer technology." *Finjan, Inc. v. Blue Coat Sys., Inc.*, 2015 WL 7351450, at \*10 (N.D. Cal. 2015) (quoting *Intellectual Ventures I LLC v. Symantec Corp.*, 100 F. Supp. 3d 371, 385 (D. Del. 2015)).

### b. Inside Secure's Arguments Rely on Improper Generalization and False Equivalency

Inside Secure fails to establish that the '149 Patent claims are abstract. Rather than grapple with the concrete limitations of the '149 Patent claims, as Supreme Court and Federal Circuit precedent require, it argues based on a bird's-eye view of the claims that ignores the concrete and specific inventions claimed therein. Inside Secure thus ignores the Supreme Court's warning that, at some level "all inventions . . . embody, use, reflect, rest upon, or apply laws of nature, natural phenomena, or abstract ideas" and that one must "tread carefully in construing this exclusionary principle [of patent eligibility] lest it swallow all of patent law." *Alice*, at 2354 (citation omitted).

Here, Inside Secure asks the Court to do exactly what the Supreme Court and Federal Circuit warned against by overgeneralizing and abstracting the claims of the '149 Patent down to nothing more than "the abstract idea of determining whether software has been modified by

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

614\2873829.11 - 14 -
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)                    4:17-CV-05860-HSG

performing a basic comparison of a mathematical calculation to a known result." (*See* Mot. at 1, 5-6, 8, 9, 10, 11.) However, Inside Secure's approach flatly disregards the actual claim limitations in order to render the claims abstract. *Enfish*, at 1337 (noting that "describing the claims at such a high level of abstraction and untethered from the language of the claims all but ensures that the exceptions to § 101 swallow the rule.") (citing *Alice*, at 2354).

Specifically, Inside Secure's bare argument that the claims recite "nothing more than a mathematical calculation, instructions to apply general principles of obfuscation, and a comparison that could be done by any person looking at two numbers, is thus a quintessential abstract idea" (Mot., at 10-11) shows a clear misunderstanding of how the claimed technology works.

A person cannot modify both source code and executable without having a computer compile one into the other. A person cannot reasonably identify the exported symbols and checksum information exported into the executable code (also referred to as a "binary" because it is made up of nothing more than the binary values of 1s and 0s) without the assistance of a computer to search for a particular sequence of values. A person cannot compute a checksum algorithm during various points of operation of a software application without a computer actually running the software application. Finally, a person cannot perform an operation to render a hacked software application unusable without a computer to perform the operations. As such, Inside Secure's argument that the claims are abstract are without merit, and the '149 Patent claims "do not merely recite the performance of some business practice known from the pre-Internet world along with the requirement to perform it on the Internet." *See DDR Holdings, LLC*, 773 F.3d at 1257.

The '149 Patent fully teaches one skilled in the art to make and use the invention and acknowledges that it omits descriptions of information, including certain embodiments, already known to one skilled in the art. ('149 Patent, 2:57-3:10.) The routine knowledge of one of ordinary skill in the art, and "a patent need not teach and preferably omits, what is well known in the art." *Hybritech Inc. v. Monoclonal Antibodies, Inc.*, 802 F.2d 1367, 1384 (Fed. Cir. 1986). Furthermore, "[w]hether a patent specification teaches an ordinarily skilled artisan how to

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

614\2873829.11                                        - 15 -
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)                              4:17-CV-05860-HSG

implement the claimed invention presents an enablement issue under 35 U.S.C. § 112, not an eligibility issue under § 101." *Visual Memory LLC v. NVIDIA Corp.*, 867 F.3d 1253, 1261 (Fed. Cir. 2017) (citations omitted). In either case, in reviewing a motion dismissal under Rule 12(b)(6), all factual inferences must be drawn in favor of the nonmoving party. *Id.,* at 1261.

Inside Secure cites to both *Intellectual Ventures I LLC v. Erie Indemnity Co.*, 2017 WL 5041460 (Fed. Cir. 2017) and *Ancora Techs., Inc. v. HTC Am., Inc.*, 2017 WL 6389329 (W.D. Wash. 2017) for the proposition that the '149 Patent's use of checksums in implementing its anti-piracy technology renders it unpatentable. (Mot., at 2:8-14.) Far from supporting Inside Secure's argument, the cited cases provide a sharp contrast with the '149 Patent and support the argument that it is not directed to an abstract idea.

The *Intellectual Ventures* patent was directed to a method for a computerized solution to a problem existing outside of computers of identifying and categorizing illicit files, e.g., a librarian searching the collection for books containing pornography. *Intellectual Ventures*, 2017 WL 5041460 at *3. There the Court correctly pointed out that the idea of "identifying and characterizing" was a branch of data collection based upon simple identification that has long been held to be an abstract idea. *Id*.

The checksum connection is facile and originates from the patentee's unsuccessful argument regarding how a dependent claim using a checksum as an identification value for the "identifying and characterizing" function rescued the patent from being an abstract idea.[6] There the patent simply recited the use of a checksum as a way to identify a specific type of file and did not change the basic character of the claims. Inside Secure cannot attempt to add additional limitations to the *Intellectual Ventures* patent to conform its attempted analogy to the '149 Patent. However, the '149 Patent's use of checksums is fundamentally different in that the checksum is not just a shorthand identifier for a type of file (there is no recited comparison to determine file modification, no modification of both the source and the executable domains to obscure that use

---

[6] The Court did not directly address the substance of the checksum-related claim as it was discussing whether the party had waived the right to dispute the use of a single representative claim as a proxy for all claims where the party had not challenged the representative nature of claim at issue. *Intellectual Ventures*, 2017 WL 5041460 at *5.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

614\2873829.11                                           - 16 -
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)                                    4:17-CV-05860-HSG

of the checksum anti-piracy function, etc.).  Moreover, the "gist" of the '149 Patent is how to implement and disguise conventional checksum validation functions by making unique modifications to both the source and executable code making identification and illicit modification or impairment of the validation function much more difficult – and not simply to identify a specific type of file.[7]

In *Ancora* the Court noted that patent did not provide any details regarding how the agent set up the structure in the BIOS, the structure itself or any other details about how the invention was an improvement in existing technology.  *Ancora Techs., Inc. v. HTC Am., Inc*., 2017 WL 6389329 at *4.  The Court concluded that reading the claims as a whole the patent was still directed to the abstract idea selecting a program, verifying whether it was licensed and taking action based upon that verification.  *Id*.  This analysis contrasts with the '149 Patent that discloses step-by-step, detailed instructions (for example providing specific algorithms and adaptations based upon specific operating systems) on how to practice the invention.  The '149 Patent does not simply add a checksum to a file then at some later time compute a checksum and make a comparison.  Rather, the '149 Patent provides detailed instructions on how to implement and disguise anti-piracy technology in two different software domains to thwart hacking of the executable file.

The other cases cited by Inside Secure to support their arguments largely fall into claim variations on the concept of gathering data, characterizing data (in some cases using mathematical identifiers) and then comparing that data set with another (in some cases also containing

---

[7] Inside Secure uses a military metaphor where a nuclear submarine's launch codes are compared to determine if there is a match.  (Mot. at 9:3-6.)  That is just simple confirmation and verification – if the President orders a launch the message with the appropriate code is sent to the submarine and is compared to the code that submarine commander has in his or her possession – nothing more.  A more accurate military metaphor would be analogizing the prior art method of implementing checksum validation codes to soldiers lining up in formation, like the British Army did in the Revolutionary War, where the checksum validation code is the British formation.  Formidable, but easily identifiable to an opponent (the hacker) and using the right techniques easily defeated.  Whereas the '149 Patent discloses a form of guerilla warfare where the opponent (the hacker) cannot identify the combatants (because they are dispersed in the general population and not in uniform) from the civilians and therefore cannot engage and defeat the guerilla soldiers.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

614\2873829.11                                     - 17 -

mathematical identifiers) to look for matches that again are inapposite to what is claimed in the '149 Patent.[8]

### 2.   The '149 Patent Claims are Patent Eligible Under *Alice* Step Two

Because the '149 Patent claims are not abstract, the Court should deny Inside Secure's Motion without reaching Step 2 of the *Alice/Mayo* analysis.  *Visual Memory*, 867 F.3d at 1262 (not performing step two of the *Alice* test because the claims at issue were found to not be directed to an abstract idea).  Nonetheless, the '149 Patent claims are further patent eligible "consider[ing] the elements of each claim both individually and 'as an ordered combination.'" *Enfish*, at 1334, 1339 (concluding that claims directed to a self-referential database are patent eligible after determining the claims are not directed to an abstract idea under step one of *Alice*). Specifically, the '149 Patent claims include concrete limitations that avoid broad preemption of the field, are based on inventive concepts, and provide tangible benefits.  *See Contentguard Holdings, Inc. v. Amazon.com, Inc.*, 142 F. Supp. 3d 510, 516–17 (E.D. Tex. 2015) (finding that all of the claims directed to distributing rights-protected digital content to a trusted computing device "provide an inventive concept sufficient to transform the nature of the claim into a patent-eligible application") (internal quotation marks omitted) (citing *Alice*, at 2355).

### a.   The '149 Patent Claims Recite Specific Limitations and Do Not Preempt the Field

As discussed above, the claims of the '149 Patent includes a number of concrete and

---

[8] In *Intellectual Ventures I LLC v. Symantec Corp.*, 838 F.3d 1307 (Fed. Cir. 2016) the claims are directed towards receiving information, classifying information, assigning a mathematical identifier and matching that identifier with a list of the same. *Id*. at 1313.  Inside Secure's citation to *OpenTV, Inc. v. Apple, Inc*., 2015 WL 1535328 (N.D. Cal. Apr. 6, 2015) is again within the same category of patents that simply claim data collection, recognition and storage by "broadcasting," "storing," "associating," "receiving," and "transmitting" identification codes. *Id*., at *3. *Blue Spike, LLC v. Google Inc.*, 2015 WL 5260506 (N.D. Cal. Sept. 8, 2015) is yet another data collection (signals), recognition (creation of reference signals) and storage of those reference signals for later comparison with other information (query signals) to find matches cases – much in line with the other case cited by Inside Secure. *Id*. at *1. *See also*, *Planet Bingo, LLC v. VKGS LLC*, 576 F. App'x 1005, 1009 (Fed. Cir. 2014) (storing and verifying winning bingo numbers). Lastly, the *FairWarning IP, LLC v. Iatric Systems, Inc.*, 839 F.3d 1089 (Fed. Cir. 2016) case is and adaptation of "make a rule" (time of access to a file) and then "apply the rule to a data set" (audit log) without anything more.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

614\2873829.11                                                     - 18 -
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)                                    4:17-CV-05860-HSG

specific limitations, and therefore cover a specific solution to the problem of software piracy, rather than broadly preempting the problem of software piracy. Inside Secure's argument that the claims of the '149 Patent are "only of 'generic' and conventional steps relating to writing software and making basic comparisons (albeit through the use of a computer)" severely misunderstands the inventive concepts claimed.

The claims do not cover all instances of employing a checksum function in validating code integrity, nor do the claims cover all ways to obfuscate a validation code within an application. Instead, the claims of the '149 Patent are directed to a process of protecting a software application by the specific method of adding validation code (employing any form of checksum calculation) and symbols throughout the software application and then later removing the exported symbols from and revising the checksum information in (which can only be calculated by a separate program after the software application has been compiled) the compiled executable version of the code by a tool that is able to locate this specific information in the executable file.

These specific limitations preclude these claims from "preempting" the field in an impermissibly broad manner. Thus, the '149 Patent claims do not give rise to preemption concerns, the main policy behind patent eligibility, and leave available unclaimed alternatives in the same field. *DDR Holdings*, 773 F.3d at 1259; *Stoneeagle Servs., Inc. v. Pay-Plus Solutions, Inc.*, 2015 WL 4042097, at *8, 10 (M.D. Fla. 2015) (computer-implemented medical payment claims patent eligible and not abstract because they did not pre-empt a "fundamental economic practice," and where there are a "myriad of methods of transmitting a payment that do not require the steps of [the] asserted claims.") (internal quotation marks and citations omitted).

Asserted dependent claims 2, 3, 5, 6, 30 and 31 add additional limitations that teach more specific refinements of the technology allowing the software developer to obscure the implementation and execution of the checksum functionality. These additional elements include storing the anti-piracy checksum in a self-referential data structure (Claim 2); the ability to distribute and daisy-chain the anti-piracy functions within overlapping software blocks (further disguising the location of the anti-piracy functions) (Claim 3); tying specific anti-piracy functions

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

614\2873829.11                                          - 19 -

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)                              4:17-CV-05860-HSG

to specific software blocks at specific locations within the software (Claim 5); allowing the developer to select among different anti-piracy checksums to further disguise the presence of the anti-piracy functions (Claim 6); allowing selection of different checksum algorithms for a given block of code identified for validation (further obscuring the checksum implementation by varying the identity of the checksum function) (Claim 30); and allowing validation of multiple code blocks by creating multiple checksum data structures (Claim 31).

The claims go beyond merely "adding limitations" and "technical sounding" terminology to an already abstract ideal. (Mot. at 15:13-20.) Inside Secure's attempt to analogize placing the license key in the BIOS as described in *Ancora* to what it describes as putting the checksum function into the executable is simply wrong. There is no analog in the '149 Patent to placing a generic license key within a specific part of the computer's memory. Rather the '149 Patent teaches actual methods and techniques for making modifications to both the source and executable code to make it impossible for a hacker to even find the checksum function within the executable.

Also, Inside Secure dismisses the obfuscation instructions as simply "use of standard programing techniques (such as deleting code)." (Mot. at 16:19-20.) Inside Secure fails to explain how making changes to the source code and then striping evidence of the changes from the executable is a "standard programming technique" and has not provided any authority for the idea that striping evidence of certain functions contained in the source from the executable is something "standard" in the industry.

These meaningful limitations are dispositive as to *Alice* Step 2 (to the extent the Court even reaches the issue)

### b.      The '149 Patent Claims Include Inventive Concepts

The '149 Claims are further patent eligible under the second *Alice* step because they include inventive concepts that provide real-world benefits. A claim drawn to an abstract idea is not necessarily invalid if the claim's limitations—considered individually or as an ordered combination—serve to "transform the claims into a patent-eligible application." *Content Extraction*, 776 F.3d at 1348. Thus, the second step of the *Alice* analysis (the search for an

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

614\2873829.11                                    - 20 -

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)                                    4:17-CV-05860-HSG

"inventive concept") asks whether the claim contains an element or combination of elements that ensures that the patent in practice amounts to significantly more than a patent upon the abstract idea itself. *Alice*, at 2355.

The U.S. Supreme Court has made clear that a transformation of an abstract idea to a patent-eligible application of the idea requires more than simply reciting the idea followed by "apply it." *Id*. at 2357 (*quoting Mayo Collaborative Servs.*, 132 S. Ct. at 1294). In that regard, the Federal Circuit has repeatedly held that "[f]or the role of a computer in a computer-implemented invention to be deemed meaningful in the context of this analysis, it must involve more than the performance of 'well-understood, routine, [and] conventional activities previously known to the industry.'" *Content Extraction*, 776 F.3d at 1347-48 (*quoting Alice*, at 2359) (alterations in original); *see also Mortgage Grader*, 811 F.3d at 1324–25 (holding that "generic computer components such as an 'interface,' 'network,' and 'database'... do not satisfy the inventive concept requirement."); *Bancorp Servs.*, 687 F.3d at 1278 ("To salvage an otherwise patent-ineligible process, a computer must be integral to the claimed invention, facilitating the process in a way that a person making calculations or computations could not.")

At around the time the '149 Patent was filed in 2002, protected software commonly used a single point of validation that could be easily detected, located, and bypassed or otherwise neutralized by a hacker. ('149 Patent, at 1:33-52.) In contrast, the claims of the '149 Patent provide a novel approach of modifying a software program to include validation code in embedded in various locations that performs partial checksum calculations of random-sized segments of the selected executable code block, thereby giving no indication to a hacker of when or where the integrity validation is taking place.[9] The allegation that the claims of the '149 Patent

---

[9] Unlike *Papst Licensing GmbH & Co. KG v. Xilinx Inc.*, 193 F. Supp. 3d 1069 (N.D. Cal. 2016) where the Court found that the generic recitation of use of "simulator" and "packer" without "any meaningful explanation" on how the claimed features implemented the methods, such as specific algorithms. Unlike *Papst*, '149 Patent provides plenty of detailed instructions on how to implement the invention. In *Papst*, the court noted that the claimed features were simply "black boxes defined by the desired function." *Id*., at pp. 1087-88. The '149 Patent provides ample instructions, including specifics on different operating systems and implementing algorithms to go well beyond a "black box" that deprived the *Papst* claims of an inventive concepts.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

614\2873829.11                                          - 21 -
PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)                                    4:17-CV-05860-HSG

do not "add anything beyond the most basic abstract method steps of inserting checksum-related information into a software program, performing a mathematical calculation, deleting the checksum-related information from the computer code, and comparing the results of the checksum to a pre-calculated reference value" (Mot., at 15) severely misses the inventive concept.

## IV.

## CONCLUSION

For the forgoing reasons the Court should deny Inside Secure's Motion.

Dated: January 16, 2018                    HOPKINS & CARLEY
                                           A Law Corporation


                                    By: */s/ John V. Picone III*
                                           John V. Picone III
                                           Attorneys for Plaintiff
                                           PACE Anti-Piracy, Inc.

HOPKINS & CARLEY
ATTORNEYS AT LAW
SAN JOSE ♦ PALO ALTO

614\2873829.11                              - 22 -

PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COMPLAINT PURSUANT TO
FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6)                              4:17-CV-05860-HSG